We'll hear counsel in Golda versus Neovaskis. Mr. Jaffray. Good morning and may it please the court, my name is Omar Jaffray. You can adjust the table. Another black one. Sorry about that. Good morning and may it please the court, my name is Omar Jaffray. And together with Mr. Deese here, I represent the plaintiff in this case. In 2010, the defendants in this case approached the United States Food and Drug Administration to conduct a pivotal clinical trial for a device known as the reducer. At that point, the defendants were seeking an investigational device exemption or an IDE, without which, under the FDA regulations, policies, and procedures, a company cannot conduct a trial in the United States. At that point, the FDA told the defendants that they could not conduct the trial in the United States and they did not receive an IDE for the trial. At that point, the defendants decided to disregard the FDA's serious criticisms and concerns and conducted the trial abroad. These facts were concealed from investors for the next 10 years and revealed for the first time at the advisory committee meeting in late 2020, shortly before the company's stock price completely collapsed. Defendants in this case have attempted to minimize the FDA's severe criticisms and disagreement that could be smoothed over without difficulty. But that simply is unpersuasive in light of the fact that the company was not even allowed to conduct the trial. So, can I ask, do you think that the misrepresentations or your alleged misrepresentations and the actions taken were more or less egregious than in Matrix initiatives? Your Honor, I would say that they were even worse than the ones in Matrix. Okay, tell me why. Your Honor, the reason is that in Matrix, for instance, if you look at the facts and the critical footnote is towards the end of the court's opinion where the defendants had said that we didn't intend to commit fraud, we were just waiting to see what the other data would look like. And so the idea was that there was, they claimed that there was uncertainty about what the data was. Over here, they knew all along from the very beginning that the FDA had a contrary view of the efficacy of the reducer. And those facts were concealed and instead they went ahead and made certain misrepresentations that were flat out wrong. So, for instance, in March of 2019, Mr. Pollan was specifically posed with pointed analyst questions about what does the FDA want? What exactly is it looking for? And he responded and he said, I do not know. Maybe they are looking for a larger study. We will meet with them again, but I believe that we already have all the data that they would like to seek for an approval. So I think that is a categorically false statement. Okay, but like in Matrix, I'm just, the reason, I'm presuming that you're going to have to say in order to prevail that this was, the actions were taken were more egregious than Tung versus Sanofi, right? And you're going to have to say that they were at least as egregious as Matrix. And you're arguing more. But one of the facts that I think is relevant is that they had actually proven that somebody had lost their smell in Matrix. And we're not seeing that here. So what is akin to that kind of thing? Because you, we can't rule for you because we're bound by precedent unless it's more than Tung versus Sanofi and at least as much as Matrix, right? Or at least, or are you saying that we can be less than Matrix and still exceed what Tung versus Sanofi found? I would say that it doesn't have to be exactly like Sanofi. There doesn't have to be a serious adverse reaction in the trial in order for the defendants to be found liable. The issue here, Your Honor, is that they made certain statements. And the question is, were those statements misleading because material facts were concealed from the investors? Why shouldn't we be concerned that essentially what you're saying here is if a company discloses any portion, any part of its discussions with the FDA on a product, that if they don't give every detail, every up and down, every conversation, that somehow they're committing fraud by omitting every detail of those conversations, shouldn't we be concerned that that is not what the court should be saying? No, Your Honor. We are not arguing that every time the FDA says something that a defendant must disclose that fact. What we are saying is that it depends on whether the fact is material. In other words, would an investor consider it important? And here, given that the FDA has told the defendants that the pivotal trial here... What did they say that was false? Let's put aside the ones you think they should have told us more about their discussions. What did they say about those discussions where you say that was false? You mentioned that earnings call. Is that the one you would point to as the most egregious example where they affirmatively said something about their dealings with the FDA that was false? Or is there something else besides that earnings call? Yes, Your Honor. The earlier statement in February where they said that the FDA has made a recommendation that we collect additional data, but they didn't explain what that was and didn't say that the... Well, you agree that it was a back and forth in the briefs. It wasn't mandatory. It was a recommendation, right? You didn't point to anything where they said they had to do that. Well, so Your Honor, I think that the defendants had characterized what the FDA said as a recommendation. But in light of the information that actually came out much later, the fact that the FDA never even allowed them to conduct the trial means that the criticisms and concerns were much more serious than just a recommendation. And I think what I would say is it's not just a question of whether something is affirmatively false. The statements can be misleading and still be actionable. And I think some of these statements... Yeah, and I don't know that there's any reasonable well-developed on this. What we're trying to do, I think, is to figure out how much is too much, right? And certainly there are exceptions for puffery or forward-looking cases and we're trying to put where this case fits into what the precedent rebound by is. Right. Your Honor, and I wanted to get back to your question about Tung v. Sanofi. I think the critical thing about the Sanofi case, which is different from here, is that there they met with the FDA and the FDA had said that we have a suggestion about how you should do the study. However, if you do the study and it is successful and it has a large effect, we will accept the trial. And that's exactly what happened and ultimately the drug was approved. So that is completely different from here where the criticism was extremely negative from the very beginning to the end. Now, in terms of do we have to have a case where we have a serious adverse reaction? We do not, Your Honor. Well, can you help me with this? Why even bother going through a trial abroad if one did not think that this would amount to evidence that would eventually lead to approval? Right? Like if they knew that it was done, done, done because of the ways it was inadequate in the first instance, why would they have done any of the later in time action? I mean, it seemed to me that the broad trial was bootstrapping, right? Like they were hoping to say, well, this person said that it was okay and then to be able to kind of amass a body of evidence to move the FDA. Well, I think to the extent of why they did, something that goes towards their motive, right? And in Matrix, there's just one sentence, I think, which is pretty apt over here, which is motive while relevant is not dispositive. And then the court moved on to explain the information that was concealed. Now, here, I think the issue is, it isn't whether they had an honest belief that they could go and do these other studies. That's not the issue here. This is not, you know, a dispute about who's right about the science. It's about the fact that they didn't disclose the material information. So, it's one thing, for instance, to tell investors, the FDA has said that there are these studies that we've done that are flawed, but we believe we can overcome it with something else. But, by the way, you should know that the FDA has a contrary view. That's not what happened here. What happened here is that they chose to conceal the information and made positive misrepresentations without disclosing that the FDA expected an additional study. Your Honor, if there are any other questions, I would like to reserve the balance of my time. Thanks very much, Mr. Jack. You have three minutes in due course. Mr. Miller? Good morning, Your Honor. It's Brian Miller from King & Spalding for the Appalese. I think the discussion that we just heard really highlighted the fact that the district court here did get this correct. The district court looked at an entire record, over 20 alleged false misstatements in the SEC filings, reviewed all the SEC filings, the analyst transcript calls, the press releases, and, importantly, the FDA Advisory Committee panel transcript that the plaintiffs rely on, before the court, in a well-reasoned decision, dismissed this case below. Now, I want to address a couple of things that came up during the argument. Judge Patters, I think you're absolutely right. The question is, why is this case worse than the Tongue v. Sanofi case? Because that's a binding Second Circuit precedent, and it's not. What happened in that case? In that case, the disclosures made by the company were much more definitive about the prospects. Remember that Neovasc never promised approval. In fact, gave ample risk disclosures, we cited in our briefs, that there could be no assurance it would get approval. Sanofi, on the other hand, said that they thought they had a 90% probability of getting FDA approval. And then, on the other side, Judge Patters, the issues that the FDA raised in Sanofi were more extreme, because in that case, they said that the FDA strongly recommended double-blinding instead of single-blinding in the clinical trial, and said the lack of doing so was a major concern. Now, contrast that, Your Honors, with what we see in the actual Advisory Committee transcript here of what the FDA staff people actually said, which is what matters, not what the panel members said, but what the FDA staff said. And they never said that we strongly recommended that it was required that these additional trials take place. Instead, they said to the panel, look, this is a situation where we have a statute that allows a breakthrough drug designation, I'm sorry, a breakthrough device designation, to try to get a needed advice to this population that can't be helped. And we have a disagreement, that's how they described it, a disagreement with the sponsor, Neovasc, about whether to do that additional clinical trial work before approval or after approval. That's all this was about, Your Honors. If you look at the company's SEC filings, they clearly disclosed that it will be likely that the FDA would require this additional clinical trial work after approval if the FDA grants the approval. The company also disclosed in its SEC filings that the staff had recommended that the trials be done before approval. So the market was well aware of what the FDA staff was recommending. It was fully disclosed. And I think, Judge Cabanas, you were very astute to look at the record in the prior case. I think if we look at A503 and A504, those are really the critical disclosures in this case. And that is the press release that the company put out when it was filing the pre-market approval application. And they said there very clearly that there was no reason to believe this application presented the quote, best chance of success within reasonable cost and time constraints. They also disclosed, as I mentioned before, Your Honors, that an additional post-market study will most likely be needed. And on page 504, in the risk disclosures, the company said the FDA may not agree with the company's belief that the totality of existing clinical evidence will provide reasonable assurance of safety and I do think that is quite a bit different because there's no question here that there were any adverse effects, that anybody had side effects. It's contrary to a lot of the cases the plaintiffs cite where there's adverse trial results, people getting seriously ill, people dying during the trials. We don't have any of that here. The only thing the plaintiffs are complaining about here is that they're quibbling with the issue, Judge Bianco, of how much do you have to say? Well, I do want you to address the ones where they say something affirmatively was said. The earnings call, I think, is one where they say something was affirmatively said in March of 2019 that was inconsistent with what the FDA was telling the company. What's your response to that? It's not at all inconsistent. What the company was saying is that they believe the totality of all of the evidence they were going to submit would support getting approval. Because remember- We don't know what's wrong with the FDA. We don't know what data they want. We've got to find out more. And he's saying they knew exactly what the problem was, they just didn't want to tell investors. What's your response to that? Well, the response to that is, I think, when you look at what the FDA said much later, a year and a year and a half later, there were continuing discussions. And the company, after that press release, or after that earnings call, disclosed repeatedly that the FDA staff was recommending the additional pre-approval clinical data. So at that point in time, when they're still in discussions, it's an accurate statement, and before the actual vote by the advisory committee, the company says repeatedly in its SEC filings and press releases, the FDA staff wants us to do this additional clinical work. So that's why I don't think that it's misleading. What about what happened earlier before the approval in Europe in 2010, I guess it was? The 2010? Why isn't that something that should have been disclosed to investors there? I think your argument is that what was happening in this later time frame was just a continuation of these concerns that the FDA had all the way back in 2010. Well, first of all, I think the plaintiffs really overreach on this, Your Honor. They keep talking about condemning the study, severe structural problems. The FDA never said anything like that. If you read what happened, it is the FDA said that they had had discussions 10 years earlier about what the end point of the COSERA-1 2010 study should be, and the company decided to do it overseas. That's all the FDA said. There's nothing in that transcript where the FDA says, we told them we had severe structural concerns with this, or they said, well, we're not willing to do what you're going to do, so we're going to do it overseas. There's nothing at all uncommon I think this was one of the points you raised, Judge Perez, there's nothing uncommon about doing clinical trials overseas, and then hoping to come back to the United States with that, plus additional data. And Judge Bianco, I think that's really the critical point. You can't look at that 2010 study in isolation. I suppose, theoretically, if that's all there was, then maybe the plaintiffs might have a better argument, but that was 10 years earlier. The product then is approved in Europe in multiple countries, actually used, actually sold, actually implanted, actually helping patients in other countries. They have the additional reducer studies. They published the results of the 2010 study in the New England Journal of Medicine, so everybody knows what the limitations of that study were, because it's published. Not only is it published in the New England Journal of Medicine, in the company's SEC filings, they also clearly disclosed what the limitations of that study were, and what the primary end point was. The plaintiffs griped that the end point was, in their view, subjective, whether an angina patient feels better and moves two scales down on a scale, as opposed to doing a treadmill test and seeing how they feel. But that was all publicly disclosed in the company's SEC filings, what the end points were. The last thing I'd like to turn... I just want to follow up on something that you told Judge Bianco. You mentioned that in the earning call, somebody said that I believe, and one of the things that I was noticing in the statements that were disputed was, there was a lot of I believes. Yes. And one was cynical. One could say that you were asking us for a ruling that basically inoculated companies for saying whatever as long as they used a word like I believe in front of it. So tell me why I should or should not be worried about such a rule. I don't think that's what we're asking, and nobody's suggesting just saying I believe something that's false gives rise to, or doesn't give rise to, a securities claim. But instead, when you're talking about forward-looking information, this is I believe that when we submit all this information and given the track record we have with this product and the earlier trials, that we'll be able to convince the FDA to approve this product. That's forward-looking as opposed to I believe something that's passed. You think that as a... I appreciate the narrowing, but you think it would be an appropriate holding to say if something was forward, that per se saying I believe if it's forward-looking protects you? Or is it something less than that? Well, you have to look at the safe harbor, and we pointed out that we do fit within the safe harbor because those are forward-looking statements, and they're accompanied by meaningful cautionary statements. So I'm not suggesting that just because you say I believe makes something protected as a forward-looking statement, you still have to fall within the safe harbor, which we do. But I don't think the court needs to make that kind of ruling. The only question here is did the district court who looked at everything get it wrong when it dismissed this case? And I think the answer is pretty clearly no, and I want to focus in the brief remaining time that I have on the Siantar allegations, because the district court paid a lot of attention to that, and it's very important. Because as this court knows, under the Tell Labs case, what the court must do is weigh the competing inferences of Siantar or fraudulent intent. And we pointed out, and the judge noted in his ruling, that the plaintiff's theory makes no sense why if in their theory, remember their theory is that the company knew it was a requirement as opposed to a recommendation, why would the company pursue a clinical trial that it knew was doomed to failure and pursue that on an expedited basis while not cashing out or doing anything else in the meantime? That theory of Siantar makes no sense. The Nguyen case in the Ninth Circuit, I know it's not binding here, but it's well-reasoned, points that out. There are other cases here. The Counted case speak about motivations of officers and directors, which are important to this issue, of whether they're engaged in fraud. And what is the competing inference that the plaintiffs offer to rebut that? What cogent theory has the plaintiff ever offered below in the briefs to this court as to how it makes sense that this company would do that knowing that the approval process was doomed to failure? There is none. Thank you. Thank you, Your Honor. There is a theory, and the theory came from Mr. Colin when he tried to justify the submission of the application, where he made misleading statements, and he said that the guidance documents supported this idea that we could go and fix the defects later on with this, what he called a post-approval study, which is the guidance documents say that you still need to have a trial done that meets the performance goal and shows efficacy before you engage in any of these so-called post-approval studies. And it was misleading to call it a post-approval study because there was no approval in the United States. So I think what they wanted to do is they couldn't do the trial that the FDA told them would be helpful towards showing the efficacy because the company didn't have the funds, and they had at that point to try and convince the FDA that whatever was there was sufficient, but they never disclosed the severe criticisms and concerns. Now, in terms of whether what words the FDA specifically used or anything like that, Your Honor, if you looked at Dr. Ryan's testimony, this is in the record, and this will be found on pages 86 and 87, lines 14 through 15. There she said that the FDA did not approve the Coursera trial. Nothing can be clearer about our theory of the case about the severity of the criticisms other than that. So it wasn't just a casual disagreement that could be smoothed over. Now, the other point that I wanted to make is that some of the statements are clearly not forward-looking. There's nothing forward-looking at all about saying that the data already collected will be sufficient to not further delay approval of this product. There's nothing forward-looking about saying we have data to show the effectiveness of the device. And, of course, there's nothing forward-looking about the misleading statements that they made about their communications with the FDA. Can I ask a question? I mean, there are a lot of... the chart in the lower court was very helpful to me. There are a lot of statements and allegations in there. Is it your position that if we find one crosses the line that we need to... like how in the course of something that took this long that was so dynamic that was actually in the real world, like how many statements do we need to find were problematic in order to rule for you? Would you say that it was one or something more than one? It only has to be one. So if you make one misleading statement at any point and there is a subsequent stock drop, you are liable for securities fraud. This is not a quantitative exercise, Your Honor. I mean, the complaint could have just pled that one statement from March and the entire class period would most likely be sustained because the stock drops happen later. So there's no quantitative requirement, even if the court were to find that one statement pled in the complaint is misleading. What happens if one statement was problematic but there wasn't a giant stock drop after it, even though one can look at the very end and see it's something? Right. So does it have to be in tied... Was there some sort of temporal proximity to what the stock was doing with the statement that was at issue? Right. So I think in your hypothetical, if you make a misleading statement and it's not followed by a loss causation event, which is a stock drop, then you cannot... No, no. I'm asking the question is does... I understand your position to be like you need to look at the stock drop at the end. I'm asking if there is a misleading statement and there's not a stock drop close by and the stock goes like that afterwards. Is that enough for that one misleading statement? Yes, it is. So long as there's a drop. It doesn't have to... So the way this works is it's not a question of what's happening to the stock price in between, so long as you can show loss causation. And that's obviously subject to expert testimony at a later stage of the litigation. At this point, we only need to show notice feeding, which we did. And I think the only thing that matters is whether negative facts were revealed at the advisory committee meeting that were concealed. It doesn't have to be a mirror disclosure. It doesn't have to be a complete revelation of the fraud either. Thank you, Your Honor. Thank you, Mr. Daffrey, very much. We thank you both. We reserve the decision and we are adjourned. Court is adjourned.